**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically at the time and date indicated, which may be materially different from its entry on the record.**



**Russ Kendig
United States Bankruptcy Judge**

**Dated: 09:42 AM June 30, 2015**

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| IN RE: | CHAPTER 7 |
| RICHARD W. VARNER, | CASE NO. 14-61103 |
| Debtor. | ADV. NO. 14-6021 |
| | JUDGE RUSS KENDIG |
| UNITED STATES TRUSTEE, | |
| Plaintiff, | |
| v. | **MEMORANDUM OF OPINION (NOT INTENDED FOR PUBLICATION)** |
| RICHARD W. VARNER, | |
| Defendant. | |

    Currently before the court is the United States Trustee's ("UST") complaint seeking to deny Richard W. Varner's ("Debtor") bankruptcy discharge under 11 U.S.C. § 727(a)(2)(A) and (a)(4)(A). Specifically, UST claims Debtor made false oaths within his bankruptcy petition in violation of § 727(a)(4)(A) and transferred or concealed assets within one year of bankruptcy with the intent to hinder, delay, or defraud creditors in violation of § 727(a)(2)(A). In contrast, Debtor argues that any false statements or concealment of assets are the result of innocent mistakes, and therefore do not rise to the level necessary to deny discharge. The court held a trial on March 31, 2015, after which the court set a post-trial briefing schedule. UST and Debtor have

1

filed their post-trial briefs and the matter is properly before the court. Based on the ensuing analysis, the court finds that Debtor lacked the requisite intent needed for a denial of discharge.

The court has jurisdiction of this case under 28 U.S.C. § 1334 and the general order of reference dated April 4, 2012. In accordance with 28 U.S.C. § 1409, venue in this district and division is proper. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J).

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the court.

**Facts**

Before filing for bankruptcy, Debtor was a successful business person owning and operating approximately twenty car dealerships under the Courtesy Auto Group ("Courtesy") umbrella. Trial Tr. 92–93, ECF No. 62. Courtesy generated millions in annual revenue, and for a time, was very successful. However, two unrelated issues lead to Courtesy's downfall, ultimately resulting in Debtor's current bankruptcy.

First, the "Great Recession" of 2008 caused a downturn in consumer demand for vehicles and a reduction in available commercial credit. Due to Courtesy's size, Debtor had numerous lines of credit, many of which were quite large, used to purchase new and used vehicle inventory. During the "Great Recession," Flex Funds, Debtor's single largest creditor providing over $68 million in financing, declared bankruptcy. Id. at 93. Debtor attempted to obtain replacement financing, but most banks and other lending institutions were fleeing the automobile financing industry at the time. Id. at 94. With the inability to obtain replacement financing, Flex Funds and many of Debtor's other financing sources began demanding payment on their loans. Id. Debtor started liquidating his inventory to meet creditor demands, suffering huge losses in the process. Id. at 95. Even after Debtor's creditors retrieved all of their collateral, millions of dollars remained outstanding on the lines of credit. Id.

Second, Courtesy's accountant engaged in activities unbeknownst to Debtor that doomed the business. Each year, Courtesy's accountant completed both Courtesy's business tax returns and Debtor's personal tax returns, showed the finished returns to Debtor, and claimed to file the returns electronically. Id. at 96–97. However, for reasons not made clear at trial, Courtesy's accountant never actually filed Courtesy's business tax returns or Debtor's personal tax returns with the IRS. Id. Sometime in 2006, an IRS agent arrived at Courtesy and informed Debtor of his failure to file tax returns with the IRS. Id. At this point, Debtor and the IRS agent walked to the accountant's office, but before reaching the office the accountant locked the door and fled the premises. Id. at 98. After unlocking the door, Debtor and the IRS agent found drawers full of IRS letters concerning the missing tax returns. Id. According to Debtor, he had no knowledge his accountant failed to file the tax returns. Id. At this point, Debtor hired a new accountant, Phil Modie ("Modie"), who began filing the missing tax returns, eventually calculating Courtesy and Debtor's unpaid IRS tax liability at approximately $8 million dollars. Id. at 99. As part of the repayment process, the IRS foreclosed upon Debtor's home, insurance accounts, stock accounts, sports memorabilia collection, as well as other items, ultimately reducing Debtor's IRS liability

2

to approximately $1.6 million. Id. at 98–99. Debtor and the IRS were working towards an offer and compromise regarding the remaining balance when Debtor filed for bankruptcy. Id. at 100.

Debtor filed for chapter 7 bankruptcy relief on October 2, 2013, listing non-exempt personal property of $10,789.59, unsecured priority claims of $3,757,003.86, and general unsecured claims of $23,341,774.26. Debtor's petition lists monthly gross income of $5,500.00, and after accounting for taxes and a domestic support obligation, average monthly income of $3,090.06. After subtracting monthly expenses of $7,791.00, Debtor's monthly net income on Schedule J was negative $4,700.94.[1] UST believes Debtor's income is actually significantly larger than that listed in his bankruptcy petition, a central issue in UST's current denial of discharge action.

After Debtor filed for chapter 7 relief, a chapter 7 panel trustee ("Trustee") was assigned to oversee Debtor's case. As part of her general review, Trustee reviewed Debtor's bankruptcy petition, bank statements, tax returns, among other documents. While reviewing this information, Trustee noted that Debtor's income information from his bankruptcy schedules did not align with deposits made into his bank accounts. For example, while Schedule I lists Debtor's monthly net income at $3,090.06, Debtor's bank statements from March to September of 2013, the seven months immediately preceding Debtor's bankruptcy, show monthly deposits of approximately $6,600.00, $7,800.00, $8,100.00, $9,500.00, $20,900.00, $16,000.00, and $1,200.00, respectively. Id. at 20; Pl.'s Ex. Q. Except for the month immediately preceding Debtor's bankruptcy filing, Debtor's bank statements show deposits well in excess of the monthly income listed in his bankruptcy petition. Trial Tr. 20. As one example, in the last few days of September 2013, Debtor deposited over $7,000.00 into his bank account. Pl.'s Ex. O 24, 27. Trustee, and later UST, began looking into Debtor's income, questioning how Debtor could make cash deposits significantly larger than his stated income, or how Debtor could afford monthly expenses exceeding his net income by over $4,500.00.

To understand Debtor's cash deposits, the form of Debtor's employment must first be evaluated. Even after Courtesy's downfall, Debtor continues to work in the automotive industry, and is the sole shareholder of Approved Acceptance Corporation ("AAC"), an S corporation doing business in Ohio. All of AAC's revenue is generated through a consulting contract with Underwood Motors ("Underwood"), which is a wholly owned subsidiary of PR, LLC ("PR"). PR is owned in part by Debtor's sister, Alma Horton ("Horton"). Under the consulting contract, PR makes monthly payments to AAC of approximately $12,000.00. Trial Tr. 103. In return, Debtor, who has extensive automotive experience, assists PR and Underwood in managing various automotive related businesses. Of PR's $12,000.00 monthly transfer to AAC, Debtor takes a salary of $5,500.00. Pl.'s Ex. T. After accounting for Debtor's salary and other business expenses, AAC's monthly profit is approximately $5,600.00. Id. Debtor also receives a weekly salary directly from Underwood of approximately $200.00. Trial Tr. 105. According to credible testimony, Debtor's direct employment with Underwood allows Debtor to maintain company health insurance. Id. This is a matter of central concern as Debtor has had cancer. While the Underwood income was not initially disclosed within Debtor's bankruptcy petition, Debtor voluntarily disclosed its existence at his § 341 meeting of creditors. Additionally, the $200.00

---

[1] While some of Debtor's expenses appear excessive, such as $400.00 per month for laundry and dry cleaning, UST has not challenged Debtor's expenses in the current proceeding.

3

per week received from Underwood is subtracted from Debtor's AAC consulting contract, resulting in no change to Debtor's monthly income. Id. at 106. At trial, Trustee stated that Debtor's initial failure to disclose his Underwood salary had no effect on her administration of the case. Id. at 36.

Debtor's schedule I only lists salary income, which cannot explain Debtor's large cash deposits. Trustee believes the excess money originated from AAC, but when she questioned Debtor, he initially appeared confused over the source of the deposits. According to Trustee, Debtor initially informed her that AAC's income, even though it was taxed to him as personal income, stayed with the business and therefore could not be the source of the additional deposits. Id. at 24. At trial, Debtor conceded that at least a portion of AAC's income was used for his personal benefit. Id. at 103. Debtor's bankruptcy petition only includes his AAC salary, not his use of AAC profits, meaning Debtor had access to and spent significantly more money than initially disclosed. Many of Debtor's normal day-to-day transactions were conducted in cash, and Debtor received his AAC salary and distributions of AAC profits in cash as well. The procedure for moving cash from AAC to Debtor occurred as follows: Debtor's grand-niece Ashley Mealey ("Mealey") would write a check to cash drawn from the PR account. Id. at 8–10. After receiving the cash, Mealey would distribute the cash to Debtor, Horton,[2] or into Debtor's bank account. Id. While the court can trace portions of the cash disbursements, large portions remain unaccounted for. For example, a spreadsheet compiled by UST shows approximately $91,000.00 in missing cash withdrawn from AAC's account. Pl.'s Ex. P. While Debtor has provided receipts and other documentation substantiating portions of his cash usage, gaps remain. Pl.'s Ex. K 57. UST argues that Mealey's cash distributions were an attempt to obfuscate Debtor's actual income and thwart the bankruptcy process. Debtor, on the other hand, states that he needed to conduct his daily financial activities in cash, as his large debts made maintaining bank accounts dangerous based on potential garnishments. While Debtor testified that he began increasing his usage of bank accounts in the months before bankruptcy because he reached agreements with many of his creditors, the fear of garnishment was always present. Buttressing Debtor's viewpoint is an August 2013 bank garnishment of $3,627.56. Pl.'s Ex. Q 20.

UST, after reviewing Debtor's bank statements, also noted the existence of very few normally recurring expenses in Debtor's bank account, such as rent or utilities, but could identify significant vacation expenses and purchases at expensive restaurants. Trial Tr. 20–21. According to Horton's uncontroverted testimony, based on prior garnishments, as well as Debtor's fear of future garnishment, Horton began making payments on many of Debtor's monthly recurring expenses. Id. at 60; Pl.'s Ex. N. Initially, Horton would obtain money orders to pay Debtor's expenses, but for increased convenience, eventually began writing personal checks drawn on her bank account. Trial Tr. 82. Horton maintained records of Debtor's expenses, and only received enough cash from Debtor to cover his expenses. Id. at 82–83. Therefore, when Mealey would make cash distributions to Horton, the amounts were only sufficient to cover Debtor's monthly expenses, meaning AAC profits did not accumulate in Horton's personal bank account. Because over $91,000.00 in withdrawals from AAC remain unaccounted for, Trustee began looking for a bank account holding AAC's accumulated earnings. As of the writing of this opinion, Debtor has not provided such information, and Trustee and UST have been unable to locate such an account.

---

[2] As noted later in this opinion, Horton paid some of Debtor's expenses out of her personal bank account.

Even though Debtor had access to more money than disclosed in bankruptcy and some cash remains unaccounted for, Debtor believes any confusion can be explained by AAC's status as an S corporation. In an S corporation, the corporation itself generally does not pay taxes, but instead the income earned by the S corporation passes through to the corporation's owners as normal personal income. Maloof v. Comm'r, 456 F.3d 645, 647 (6th Cir. 2006). Based on this pass through taxation system, the income or losses of an S corporation become each owner's individual profits and losses. Bufferd v. Comm'r, 506 U.S. 523, 525 (1993). As noted above, PR pays AAC an annual consulting fee of $144,000.00. Of this amount, $66,000.00 is distributed to Debtor as salary.[3] After accounting for Debtor's salary, as well as other business expenses,[4] AAC claimed 2012 taxable income of $67,438.00, which was included as personal income on Debtor's 2012 individual tax return. Pl.'s Exs. S, T.

Debtor testified that because AAC is an S corporation with pass through taxation, he did not view his withdrawals from AAC as income. Modie offered similar testimony, stating that an owner's withdrawal of cash from an S corporation, from a tax standpoint, is similar to using an ATM. Pl.'s Ex. K 34. Debtor believes UST is attempting to punish him for the withdrawal and use of his own money. Therefore, because question one of Schedule I asks for a debtor's "Income," specifically "monthly gross wages, salary, and commissions," Debtor did not feel that disclosure of AAC profits was needed.[5] Similarly, according to Modie, it is completely understandable that a debtor would not consider S corporation withdrawals as income. Id. at 32–34, 46. AAC also had significant net operating loss carryforward amounts reducing AAC's taxable income, adding further confusion. Differences in the terminology used within an income tax return and a bankruptcy petition can also be difficult to reconcile. Id. at 48–49. Based on this combination of factors, Modie argues that it is very difficult to determine Debtor's income for the purposes of Schedule I, as Debtor's salary income, taxable income (salary and AAC profits), and cash flow were all very different. Id. at 48–49.

Finally, UST points to additional transfers out of Debtor's bank account, which UST believes are gifts that were not, but should have been, disclosed within Debtor's bankruptcy petition. For example, UST identifies two jewelry purchases and a watch repair for Debtor's girlfriend of approximately $921.00, $586.00, and $2,175.00, respectively. Trial Tr. 20–21. Debtor states that he did not disclose the watch repair because his girlfriend repaid the amount, making the repair no longer a gift. Id. at 107. The court has no evidence Debtor was repaid. Debtor does admit to purchasing jewelry for his girlfriend, but states that he believes the bankruptcy petition only asked about gifts larger than $1,000.00. According to the statement of financial affairs ("SOFA") question 7, a debtor must disclose all gifts aggregating more than $200.00 made to an individual within one year of bankruptcy, unless the gift was an "ordinary and usual" gift made to a family member. While Debtor was forthcoming about each transaction once raised by Trustee, the undisclosed gifts would not have come to light without Trustee's in-depth review of Debtor's bank statements. UST also notes the purchase of a $2,822.24 computer

---

[3] According to Modie, the amounts claimed as either personal income and business profit is important, as only salary income requires the payment of IRS payroll taxes. Pl.'s Ex. K 42.
[4] Debtor's tax documentation lists expenses such as rent, licenses, and legal and professional fees. Pl.'s Ex. S.
[5] As will be discussed in more detail below, even if the disclosure of AAC profits was not required by question one on Schedule I, other portions of the bankruptcy petition arguably require such disclosure.

5

for Debtor's minor son, but Debtor testified that his son paid over 75% of the purchase price. Id. at 107. The computer purchase was not listed within Debtor's bankruptcy petition.

**Law & Analysis**

UST brings claims against Debtor under § 727(a)(2)(A) and (a)(4) seeking to deny Debtor's bankruptcy discharge. The denial of discharge is the most severe sanction available in bankruptcy. CM Temp. Servs., Inc. v. Bailey (In re Bailey), 375 B.R. 410, 420–21 (Bankr. S.D. Ohio 2007); Stapelton v. Yanni (In re Yanni), 354 B.R. 708, 711 (Bankr. E.D. Pa. 2006); see also Rosen v. Bezner, 996 F.2d 1527 (3d Cir. 1993); Roodhof v. Roodhof (In re Roodhof), 491 B.R. 679, 686–87 (Bankr. M.D. Pa. 2013) (calling the denial of discharge a "death knell" that "must be considered with great care"). The discharge is also the beating heart of the bankruptcy system, allowing a debtor, under the proper circumstances, to climb out of debt and being again with a financial fresh start. In re Levine, 287 B.R. 683, 695 n.11 (Bankr. E.D. Mich. 2002); Yoppolo v. Walter (In re Walter), 265 B.R. 753, 758 (Bankr. N.D. Ohio 2001). For these reasons, any action to deny discharge has long been construed liberally in a debtor's favor and strictly against the party seeking to deny discharge. Bullis v. O'Beirne, 195 U.S. 606, 619–20 (1904); Keeney v. Smith (In re Keeney), 227 F.3d 679, 683 (6th Cir. 2000); Newman v. Burnham (In re Newman), 126 F.2d 336, 337 (6th Cir. 1942); In re Walter, 265 B.R. at 758. However, a discharge is a privilege and not a right and should inure only to the honest but unfortunate debtor. Grogan v. Garner, 498 U.S. 279, 286–87 (1991). "[T]he bankruptcy court must balance the policy in favor of liberally applying the Bankruptcy Code to grant discharge to the honest debtor against the policy of denying relief to debtors who intentionally engage in dishonest practices and violate the Bankruptcy Code provision." In re Walter, 265 B.R. at 758 (quoting Solomon v. Barman (In re Barman), 237 B.R. 342, 352 (Bankr. E.D. Mich. 1999)).

The party attempting to deny discharge, UST in the current case, must prove each element of a § 727 action by a preponderance of the evidence. Fed. R. Bankr. Pro. 4005; Barclays/Am. Bus. Credit, Inc. v. Adams (In re Adams), 31 F.3d 389, 394 (6th Cir. 1994). If UST is able to provided sufficient evidence on each element of a § 727 claim, the burden shifts to Debtor to justify his actions. Sicherman v. Murphy (In re Murphy), 244 B.R. 418, 421 (Bankr. N.D. Ohio 2000). If Debtor cannot rebut UST's evidence, discharge will be denied. Id.

It is important to repeat what this case is *not* about. This is not a § 707(b) matter in which the court picks at and rakes though innocuous expenses because a few dollars here and there can have dramatic consequences. Rather, the court is picking at and raking through comparatively innocuous expenses because that is the worst that can be located after pouring over the records of a man who operated twenty automobile dealerships and has in excess of $3,000,000.00 in tax debts and $23,000,000.00 in general unsecured debts. With that backdrop, the worst actions brought to the court's attention are a watch repair, a computer purchase for Debtor's son, and undisclosed income amounts from a corporate structure that is legitimately confusing to integrate with the questions in a bankruptcy petition.

Ultimately, several factors impelled a conclusion in Debtor's favor. First, Debtor was found to be credible in his testimony before the court. Second, the matters that were undisclosed or incorrectly disclosed would not have created a financial loss to Debtor even if properly

6

disclosed, adding weight to Debtor's argument that he lacked a motive to make false statements. Finally, many of the forms and terms within a bankruptcy petition do not neatly apply to a debtor with an unusual fact pattern, such as the current case.

## I. Debtor Did Not Knowingly and Fraudulent Make A False Oath In Violation of § 727(a)(4)(A)

Under § 727(a)(4)(A), a debtor's bankruptcy discharge may be denied if he "knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." According to the Sixth Circuit, a violation of § 727(a)(4)(A) requires the party objecting to discharge to prove the following elements:

> (1) the debtor made a statement under oath;
> (2) the statement was false;
> (3) the debtor knew the statement was false;
> (4) the debtor made the statement with fraudulent intent; and
> (5) the statement related materially to the bankruptcy case

Eifler v. Wilson & Muir Bank & Trust Co., 588 Fed. App'x 473, 477 (6th Cir. 2014); In re Keeney, 227 F.3d at 685.

"The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors have accurate information without having to do costly investigations." U.S. Tr. v. Zhang (In re Zhang), 463 B.R. 66, 86 (Bankr. S.D. Ohio 2012); see also Boroff v. Tully (In re Tully), 818 F.2d 106, 110 (1st Cir. 1987) ("Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight."). Bankruptcy trustees have neither the time nor resources to conduct in-depth reviews of each and every debtor, making accurate initial disclosures a key feature of the United States bankruptcy system. Carlucci & Legum v. Murray (In re Murray), 249 B.R. 223, 230 (E.D.N.Y. 2000); Roudebush v. Sharp (In re Sharp), 244 B.R. 889, 891–92 (Bankr. E.D. Mich. 2000). Therefore, while a bankruptcy discharge is the "carrot" at the end of the bankruptcy case, § 727 is the "stick," ensuring that a debtor's intentionally false statements have severe consequences. Coleman v. McLean (In re McLean), 2013 WL 5863718, at *3 (Bankr. E.D. Tenn. 2013); U.S. Tr. v. Halishak (In re Halishak), 337 B.R. 620, 630 (Bankr. N.D. Ohio 2005).

The first element of a § 727(a)(4)(A) action requires a statement under oath, which is satisfied by any statement in a debtor's bankruptcy schedules or made at a § 341 meeting of creditors. Richard Sefton & Rest. Staffing Inc. v. Delia (In re Delia), 2015 WL 1379616, at *3 (Bankr. E.D. Mich. 2015); McDermott v. Roller (In re Roller), 2014 WL 644590, at *7 (Bankr. N.D. Ohio 2014). The second element requires the statements made under oath be actually false, which is a question of fact for the court. In re Delia, 2015 WL 1379616, at *3. Skipping to element (5), materiality only requires that a debtor's false statement "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence or disposition of his property." Sheehan & Assocs. v. Lowe, 2012 WL 3079251, at *7 (E.D. Mich. 2012); Duree & Assocs., P.C. v. Dunn (In re Dunn), 2014 WL 1612232, at *4 (Bankr. E.D. Ky. 2014).

7

In many § 727(a)(4)(A) actions, the most commonly contested elements are (3) and (4): the debtor's knowledge that his statement were false and that the debtor made the statements with fraudulent intent. In re Halishak, 337 BR. at 627. "Knowledge that a statement is false can be evidenced by a demonstration that the debtor knew the truth, but nonetheless failed to give the information or gave contradicting information." Ayers v. Babb (In re Babb), 358 B.R. 343, 355 (Bankr. E.D. Tenn. 2006). Fraudulent intent "requires that the debtor . . . made or failed to make the statement with the intention of being fraudulent." Hunter v. Sowers (In re Sowers), 229 B.R. 151, 159 (Bankr. N.D. Ohio 1998). Demonstrating fraudulent intent "involves a material representation that [the debtor] know[s] to be false, or, what amounts to the same thing, an omission that [the debtor] know[s] will create an erroneous impression." In re Keeney, 227 F.3d at 685. Before a statement will be sufficient to deny discharge under § 727(a)(4)(A), the statement must be made with actual, not constructive, fraudulent intent. McDermott v. Schwartz (In re Schwartz), 527 B.R. 266, 275 (Bankr. E.D. Mich. 2015). However, false statements made without adequate care for their accuracy may be sufficiently reckless to justify the denial of discharge. In re Keeney, 227 F.3d at 686; Becker v. McInerney (In re McInerney), 509 B.R. 109, 115 (Bankr. E.D. Mich. 2014). "A debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath." Eifler v. Wilson & Muir Bank & Trust, 2014 WL 314473, at *10 (W.D. Ky. 2014) (quoting In re Tully, 818 F.2d at 111). On the other hand, "[a] false statement resulting from ignorance or carelessness does not rise to the level of knowing and fraudulent." Roberts v. Oliver (In re Oliver), 414 B.R. 361, 374–75 (Bankr. E.D. Tenn. 2009); see also In re Keeney, 227 F.3d at 686.

A debtor will rarely admit to making a statement with fraudulent intent, and therefore courts must infer the requisite state of mind through circumstantial evidence and the debtor's conduct. In re Sowers, 229 B.R. at 159; Stevenson v. Cutler (In re Cutler), 291 B.R. 726 (Bankr. E.D. Mich. 2003). Fraudulent intent is a factual issue determined by the court based on the totality of the circumstances. In re Keeney, 227 F.3d at 686; Hamo v. Wilson (In re Hamo), 233 B.R. 718, 724 (B.A.P. 6th Cir. 1999); Eifler, 588 Fed. A'ppx at 477. Some factors courts often evaluate are the "materiality, amount, and nature of a debtor's false statements, as well as the overall credibility of the debtor." Eifler, 588 Fed. A'ppx at 478; Jahn v. Hughes (In re Hughes), 490 B.R. 784, 792 (Bankr. E.D. Tenn. 2013). Courts have also looked to how the error was discovered and the debtor's motive to make the omission or false statement. LaRocco v. Smithers (In re Smithers), 2006 WL 509396, at *3 (B.A.P. 6th Cir. 2006); J&R Inv. Co. v. Anthony (In re Anthony), 515 B.R. 831, 837 (Bankr. D. Utah 2014). While the existence of one error may not be sufficient to deny discharge, "[a] series or pattern of errors or omissions may have a cumulative effect giving rise to an inference of an intent to deceive." In re Cutler, 291 B.R. at 726. Often, the ultimate outcome is dependent on the court's assessment of the debtor's credibility. In re Smithers, 2006 WL 509396, at *3.

UST has alleged Debtor made false statements under oath with the intent necessary to deny discharge for: (1) Debtor's failure to properly report AAC income; (2) Debtor's failure to disclose Horton's bank account; and (3) Debtor's failure to disclose gifts. The court will evaluate each allegation in turn.

A. **Debtor's False Oath Regarding his AAC Income Was Not Made with Fraudulent Intent**

UST argues that Debtor's income amounts listed on Schedule I and within the SOFA are inaccurate, as they do not include Debtor's business income derived through AAC, and the errors were made with fraudulent intent. Debtor on the other hand, attempts to explain his lack of disclosure on confusion surrounding AAC's status as an S Corporation. As summarized by the Sixth Circuit:

> A Subchapter S corporation is a small corporation that has elected, under the Internal Revenue Code, to be taxed similarly to partnerships. When a corporation has elected to be taxed under Subchapter S, the corporation itself is not subject to income tax. Rather, the income tax is imposed directly on the shareholders on a pro rata basis. In other words, the corporation's income "passes through" to the shareholders, who then report that income on their individual tax returns.

Friedman v. Comm'r, 216 F.3d 537, 538 n.2 (6th Cir. 2000). Because Debtor was the sole shareholder of AAC, any profits earned by the company are immediately taxable on Debtor's personal income tax return. For example, in tax year 2012, AAC's tax return shows business income of $67,438.00, which Debtor subsequently claimed, in full, on his 2012 personal income tax return. Pl.'s Exs. S, T. Debtor's 2012 personal income tax return also shows $66,000.00 in wage income, which was the portion of the PR consulting contract Debtor claimed as personal income. Pl.'s Ex. T. Therefore, according to Debtor, because he already paid personal income taxes on AAC's earnings, he did not view subsequent cash withdrawals from AAC as income. Buttressing Debtor's arguments are the statements of his accountant, which likened an owner's withdrawals from an S corporation to a normal person's ATM withdrawals. Pl.'s Ex K 34. This is hornbook subchapter S practice demonstrating the benefits and detriments of this corporate form. Such an owner may have years with loads of profits creating lax liability without cash available to pay it, and other years with the opposite outcome, available cash and tax losses. An S corporation is equal parts blessing and curse.

Turning to the elements of § 727(a)(4)(A). First, under element (1), the statement in question must be made under oath. Statements made within a bankruptcy petition or at a § 341 meeting of creditors satisfy the under oath requirement. In re Roller, 2014 WL 644590, at *7. UST points to allegedly false statements and omissions within Debtor's Schedule I and SOFA, both of which are part of Debtor's bankruptcy petition, satisfying element (1).

Second, the court must determine if the statements at issue are false. Whether a statement is actually false is a question of fact to be determined by the court. In re Delia, 2015 WL 1379616, at *3. Schedule I, titled "Current Income of Individual Debtor," asks a debtor, in two separate questions, to list all: "[m]onthy gross wages, salary, and commissions" and "[r]egular income from operation of a business." Debtor listed his $5,500.00 salary income under "monthly gross wages," but $0.00 for business income. Question 13 on Schedule I, serving as a catch-all, requires a debtor to list "[o]ther monthly income," but Debtor again listed $0.00. Moving onto

9

the SOFA, question 1 asks a debtor to "[s]tate the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business, including part-time activities either as an employee or in independent trade or business, from the beginning of the calendar year. State also the gross amounts received during the two years immediately preceding this calendar year." Debtor only listed his salary income of $66,000.00 ($5,500.00 per month x 12 months) for 2013, and -$1.00 for years 2011 and 2012. Question 2 of the SOFA asks a debtor to "[s]tate the amount of income received by the debtor other than from employment, trade, profession, or operation of the debtor's business during the two years immediately preceding the commencement of the case," and Debtor checked the box indicating that no such income has been received. Debtor's 2013 income tax return lists $75,400.00 in salary income, $36,783.00 in commission income,[6] and $46,024.00 of income generated by an S corporation. Def.'s Ex. 2.C. Debtor's 2012 income tax return is similar, listing $66,000.00 as salary income, $91,961.00 as commission income, and $68,877.00 in S corporation income. Pl.'s Ex. T. While Debtor earned significant income (consisting of both salary, commission, and flow through S corporation earnings) in both 2012 and 2013, a net operating loss carryforward reduced Debtor's total taxable income to $41,876.00 in 2013 and -$70,537.00 in 2012. First, the court notes that reconciling Debtor's bankruptcy petition with his tax returns is not an easy task, especially due to differences between Debtor's taxable wage income, taxable S corporation income, and total taxable income. However, Schedule I asks a debtor to list his "[r]egular income from operation of a business" and SOFA question one asks a debtor to "[s]tate the *gross* amount of income the debtor has received from . . . operation of the debtor's business." Debtor is the 100% owner of AAC, and as such, earns significant income from AAC, especially due to his spending of AAC earnings on personal expenses, requiring disclosure. SOFA question one also asks for gross income, requiring disclosure of business income before deducting expenses, not income after subtracting expenses and a net operating loss. Debtor made a false statement satisfying element (2).

Skipping to the final element, the false statements must be material to the bankruptcy case. In re Keeney, 227 F.3d at 685. Materiality is normally an easily satisfied standard, only requiring that the false statement "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings or the existence and disposition of property." In re Zhang, 463 B.R. at 86. This standard is satisfied in the current case, as Debtor's use of AAC assets, especially after withdrawal from AAC for personal use, represent the disposition of substantial estate property.[7]

As is often the case, the most difficult questions swirl around elements (3) and (4), which ask the court to delve into a debtor's state of mind. In re Halishak, 337 B.R. at 627. When evaluating a debtor's intent, courts looks to the totality of the circumstances to determine if the requisite fraudulent intent or recklessness is present. In re McInerney, 509 B.R. at 114. One factor courts have evaluated is the financial sophistication of the debtor, noting that a sophisticated business person is less likely to make mistakes within a petition. In re Halishak, 337 B.R. at 632; see also Ne. Fed. Credit Union v. Garcia (In re Garcia), 260 B.R. 622, 631

---

[6] UST has not alleged that the commission income was not properly disclosed within Debtor's bankruptcy petition, and therefore will not be evaluated by the court.

[7] Many courts have found that the assets of a business that is 100% owned by a debtor, under certain circumstances, may be part of the bankruptcy estate even before withdrawal for personal use. In re Zhang, 463 B.R. at 79–83.

(Bankr. D. Conn. 2001); Harman v. Brown (In re Brown), 56 B.R. 63, 67 (Bankr D.N.H. 1985). Debtor is sophisticated, growing Courtesy from a small business into a multi-million dollar enterprise. While Debtor routinely employed an accountant to handle the finer details of his personal and business taxes, the court nevertheless finds that Debtor is sufficiently sophisticated to understand his business structure, and should have disclosed AAC's business income within his petition. Additionally, Debtor appears to have listed his personal wage income from AAC from tax year 2012 as his 2013 income on SOFA question one. For 2011 and 2012, Debtor listed gross income of -$1.00, which corresponds with AAC's negative net income in the same years. Debtor claims that the amounts in SOFA question 1 represent numbers pulled directly from Debtor's income tax returns, but why 2013 income would represent only Debtor's wage income, and 2012 and 2011 represent Debtor's total income after including AAC's negative S corporation earnings, was not adequately explained. Significant unaccounted for cash withdrawals are also a concern. Debtor claims the withdrawals were used for living expenses and UST has not provided sufficient countervailing evidence.

However, even in light of Debtor's above errors, mitigating factors are present. First, Debtor disclosed his AAC ownership on Schedule B. If Debtor was attempting to hide AAC through the omission of business income, Debtor would likely omit his corresponding ownership interest. See In re Halishak, 337 B.R. at 631; Harker v. West (In re West), 328 B.R. 736, 739 (Bankr. S.D. Ohio 2004). For example, in In re West, the debtor purchased jewelry for over $30,000.00, but only listed $2,000.00 as the jewelry's value in her bankruptcy petition. 328 B.R. at 739. However, the court considered debtor's disclosure of secured claims against the same jewelry as a mitigating factor, because if the debtor truly intended to undervalue or hide the jewelry, she would not have disclosed other factors putting the trustee on notice of the jewelry's potentially greater value. Id.; see also In re Anthony, 515 B.R. at 837–38. Additionally, in his answers to SOFA question 1, Debtor lists gross business income as -$1.00 for both 2011 and 2012, and because gross income represents earnings before expenses and other deductions, a negative amount is extremely unlikely. While this error should have been remedied by Debtor, the clearly erroneous nature of the answer points more directly towards mistake, not fraud. The court also notes that Debtor provided Trustee with copies of his income tax returns before the § 341 meeting of creditors, allowing Trustee to easily identify Debtor's salary and S corporation income. While one of the main purposes of § 727(a)(4)(A) is to prevent a trustee from needing to conduct an in-depth review of each debtor, when a trustee can easily identify errors during normal procedures, such as reviewing a debtor's tax returns, the trustee's investigative burden associated with an omission is greatly reduced. See In re West, 328 B.R. at 748–49.

The court also finds that Debtor was legitimately confused when reporting AAC's business income in the bankruptcy petition. While Debtor, a sophisticated business person, should have properly reported his income, the combination of S corporation income and a net operating loss carryforward made Debtor's income much harder to determine than the average bankruptcy case. Courts have often excused a debtor's failure to properly list income amounts when the debtor was legitimately confused about where (or if) the income should be disclosed. See Manning v. Watkins (In re Watkins), 474 B.R. 625, 654 (Bankr. N.D. Ind. 2012) (noting that when the proper way to disclose an asset within the bankruptcy petition is unclear, errors are less likely to be evidence of fraudulent intent); Fokkena v. Peterson (In re Peterson), 356 B.R. 468, 477–78 (Bankr. N.D. Iowa 2006) (excusing the debtor's misstatements based on differences

11

between cash and accrual accounting methods); Gordon v. Courtney (In re Courtney), 351 B.R. 491, 507 (Bankr. E.D. Tenn. 2006) (excusing a debtor's failure to disclose as income the value of checks drawn on his business account to cover personal expenses, especially when disclosed elsewhere in his petition); Schreiber v. Emerson (In re Emerson), 244 B.R. 1, 23 (Bankr. D.N.H. 1999) (excusing a debtor's failure to independently disclose income derived from rental property, especially when the property ownership was disclosed and the profit amounts were included within Debtor's total income figures); Posl-Bendsen v. Leonard (In re Leonard), 2014 WL 2696753, at *10–11 (Bankr. D. Kan. 2014) (excusing the debtor's failure to disclose trust income due to genuine confusion about the need to include trust income within a bankruptcy petition).

Courts also often evaluate the debtor's motive when making a false statement. In re Smithers, 2006 WL 509396, at *3; In re Halishak, 337 B.R. at 631–32. In the current case, Debtor has $23,341,774.26 in general unsecured debt, which is likely dischargeable. It makes little sense for Debtor to risk his entire discharge by failing to disclose approximately $60,000.00 in business income, especially when such disclosure would change nothing about the bankruptcy case.[8] Debtor was hopelessly insolvent with or without the income disclosure. The income amounts create no more or no less non-exempt property that could be lost to creditors. This mitigates against the interpretation of the intentional lie and in favor of an interpretation that Debtor spent years running around with his "financial hair" on fire, with a dollop of cancer thrown in just to keep life interesting. While the court notes that debtors have been known to act irrationally, a lack of motive weighs against a finding of fraudulent intent. Bernhardt v. Radloff (In re Radloff), 418 B.R. 316, 323–24 (Bankr. D. Minn. 2009) ("[The court] must analyze the omissions or nondisclosures as to whether they were part of a scheme on the part of the debtor to retain assets for his own benefit at the expense of his creditors."); but see Kovacs v. McVay (In re McVay), 363 B.R. 824, 830 (Bankr. N.D. Ohio 2006) (holding that the debtor's failure to list firearms that were largely exempt still warranted a discharge denial, as the debtor was not aware the property was exempt when the false statements were made). Finally, the court finds Debtor's testimony to be generally credible, which is often the determinative factor in a court's denial of discharge determination. In re Smithers, 2006 WL 509396, at *3. Based on all of the above, the court holds that Debtor's failure to properly disclose AAC's S corporation income was not a false statement made with recklessness or fraudulent intent.

### B. Debtor's Failure to List Horton's Bank Account Was Not Made with Fraudulent Intent

UST argues that Debtor's failure to disclose Horton's bank account, which Horton used to pay some of Debtor's recurring monthly personal expenses, is a false oath sufficient to deny discharge under § 727(a)(4)(A). In response, Debtor argues that he was not required to disclose Horton's bank account, as he had no interest in the account as of the petition date. In the alternative, even if the court finds that Debtor failed to disclose Horton's bank account, Debtor argues that he lacked fraudulent intent. Schedule B asks a debtor to "list all personal property of whatever kind" and also directs a debtor to disclose any "property [] being held for the debtor by someone else." Specifically relating to bank accounts, Schedule B requires disclosure of

---

[8] Because Debtor's debts are primarily business debts, the excess income, even if properly disclosed, would not push Debtor over the "Means Test" and into a chapter 13 case. 11 U.S.C. § 707(b)(1).

"[c]hecking, savings, or other financial accounts," to which Debtor listed two personal bank accounts, but did not disclose the Horton account.

The alleged omissions occurred in Debtor's Schedule B, which is a part of Debtor's bankruptcy petition, satisfying the under oath element of § 727(a)(4)(A). Materiality is also satisfied, as the asset only need "bear[] a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings or the existence and disposition of property." Sheehan & Assocs., 2012 WL 3079251, at *7. Horton's bank account used Debtor's assets to pay expenses, and therefore sheds light on the disposition of potential estate property, satisfying element (5). The other three elements are more difficult.

First, Schedule B explicitly requires the disclosure of assets held in bank accounts, even if the bank account is maintained by another. Legal ownership of the asset is not required, as courts have found a "beneficial ownership" when a debtor retains the benefit of and control over an asset titled to another. In re Keeney, 227 F.3d at 682–83. For example, in In re Keeney, the debtor retained a beneficial interest over real property when he placed the asset in the name of a relative, but continued to live on the property and make all associated mortgage payments. 227 F.3d at 683–84. Similarly, the debtors in In re Halishak failed to disclose bank accounts titled in the names of family members, but continued to use the account like their normal personal bank account. 337 B.R. at 627–28; see also U.S. Tr. v. Garland (In re Garland), 417 B.R. 805, 817 (B.A.P. 10th Cir. 2009); Deangelis v. Von Kiel (In re Von Kiel), 461 B.R. 323, 340–41 (Bankr. E.D. Pa. 2012). Courts have consistently required the disclosure of a debtor's beneficial interests within a bankruptcy petition, and the failure to list such assets may be the basis for a denial of discharge. In re Keeney, 227 F.3d at 683–84; Wachovia Bank, N.A. v. Spitko (In re Spitko), 357 B.R. 272, 313 (Bankr. E.D. Pa. 2006). Therefore, if Horton's bank account contained Debtor's assets as of the petition date, Debtor likely has a beneficial interest requiring disclosure. However, Horton's uncontroverted testimony stated that she only received enough money from Debtor to cover his expenses as they became due. UST provided no evidence of Debtor's assets accumulating in Horton's account. Therefore, while it is possible that Debtor filed bankruptcy in the time period between Horton's receipt of Debtor assets and her subsequent payment of Debtor's bills, no evidence towards that end has been presented.

However, "there is no hint anywhere in the numbered list of the 35 types of property on the Schedule B form that property is to be listed only if it has value." In re McInerney, 509 B.R. at 120. The court was able to identify at least one case where a debtor's discharge was denied, at least in part, due to the debtor's failure to disclose a bank account with a zero balance. Bologna v. Cutignola (In re Cutignola), 87 B.R. 702 (Bankr. M.D. Fla. 1988). Similarly, the SOFA requires a debtor to list all bank accounts closed within one year of the filing of a bankruptcy petition,[9] a requirement adopted at least in part to allow a trustee to trace the financial flow of a debtor's assets. This policy goal does not change whether the account has a zero balance or was previously closed. Additionally, numerous Sixth Circuit cases require a debtor to disclose property, even if the debtor believes the property has no value or has a value below the applicable exemption. In re Opra, 365 B.R. 728, 740 (Bankr. E.D. Mich. 2007); In re Halishak, 337 B.R. at 631. These courts require the disclosure of "worthless" property because the trustee and creditors should have the ability to value an asset, not be left in the dark as to an asset's

---

[9] Similar to the current case, a closed bank account has a $0.00 balance.

existence based on a debtor's potentially self-serving valuation. See In re Smithers, 2006 WL 509396, at *4; Heidkamp v. Grew (In re Grew), 310 B.R. 451 (Bankr. M.D. Fla. 2004); Lewis v. Summers (In re Summers), 320 B.R. 630, 647 (Bankr. E.D. Mich. 2005). However, questions about an asset's value are only relevant when as asset has multiple potential valuations. A bank account has one, and only one, value, which is known by all parties down to the penny. Disclosure requirements based on potential valuation differences should not apply to a bank account. Therefore, it is unclear if Schedule B requires Debtor to disclose the Horton account, but the court need not decide the issue, as the court finds that Debtor lacks fraudulent intent.

First, as the above paragraph makes clear, genuine confusion exists about Debtor's need to disclose the Horton account, weighing against a finding of fraudulent intent. See In re Leonard, 2014 WL 2696753, at *10–11. Additionally, many cases denying a debtor's discharge for failure to disclose a beneficial interest involve transactions where the most likely explanation is the improper shielding of assets. In re Keeney, 227 F.3d at 682–83; In re Halishak, 337 B.R. at 631–32; C & H Elec. v. Newell (In re Newell), 321 B.R. 885, 891 (Bankr. N.D. Ohio 2005). For example, in In re Newell, the debtor transferred a boat for no consideration to his brother just before filing bankruptcy, and also failed to list the property or the transfer in his bankruptcy petition. 321 B.R. at 891. The court noted that such a transfer, occurring so close to bankruptcy, suggests that the debtor is attempting shift the property's equity to a family member instead of creditors. Id.; see also In re Keeney, 227 F.3d at 682–83. These types of shielding transaction have no legitimate purpose, but the current case is quite different. Horton has been paying Debtor's recurring monthly bills long before Debtor's bankruptcy filing, suggesting that the transfers were not entered into with the main goal of concealment. No evidence was provided suggesting Debtor maintains control over the Horton account, only that Debtor asked Horton to pay certain bills from that account. Additionally, based on the fear of garnishment, Debtor has a practical and credible explanation for starting to use Horton's account. While Horton's account may shield assets from some creditors, Debtor used the account to pay other creditors, not retain assets for himself. As long as Debtor was not accumulating money in the account, it was being used for no purpose other than an acceptable one—to pay bills as they became due. That this was done because of garnishment is irrelevant since the money was used solely for legitimate purposes. Based on the above, Debtor lacked the fraudulent intent required under § 727(a)(4)(A) when he did not disclose Horton's bank account.

      **C.**      **Debtor's Failure to List Gifts Was Not Made with Fraudulent Intent**

Finally, UST argues that Debtor's failure to lists four separate gifts within his SOFA are false statements requiring a denial of discharge under § 727(a)(4)(A). Question 7 of the SOFA asks a debtor to "[l]ist all gifts or charitable contributions made within one year immediately preceding the commencement of this case except ordinary and usual gifts to family members aggregating less than $200 in value per individual family member and charitable contributions aggregating less than $100 per recipient." Debtor checked the box indicating that no such transfers had occurred. However, via evaluation of bank statements, Trustee identified the purchase of the following gifts: $921.25 necklace; $586.00 earrings; a $2,183.25 watch repair; and a $2,822.24 computer. While Debtor was forthcoming about the purchases once raised by Trustee, the transactions would never have been discovered without Trustee's careful review of Debtor's bank statements. A debtor cannot avoid consequences simply through being

14

forthcoming after an omission or inaccuracy is discovered. In re Hughes, 490 B.R. at 793–94; In re McVay, 363 B.R. at 829; In re Babb, 358 B.R. at 359. As a justification, Debtor states that he was repaid for the $2,183.25 watch repair, making the transaction not a gift. Also, Debtor believes that the purchase of a computer for his minor son should not be classified as a gift, but instead as a normal father-to-child transaction. Debtor's other justification is his belief that he only needed to disclose gifts over $1,000.00, making the neckless and earring purchases below the applicable threshold.

      As to elements (1) and (2), it is clear that the SOFA requires the disclosure of all gifts greater than $200.00, making, at the very least, Debtor's omission of the necklace and earrings false statements made under oath. Debtor paid over $2,000.00 for a watch repair for his girlfriend, but asserts, without supporting documentation, that the amount was repaid. Debtor's self-serving statements, without more, are insufficient. Debtor's failure to list the repair is a false statement. However, Debtor's purchase of a laptop computer for his minor son was not a gift, and therefore need not be disclosed. In the normal day-to-day usage of the word "gift," very few people would consider the purchase of clothes, food, or other such items for their dependents as gifts. For example, in In re Oliver, the debtor's long time support payments to a live-in girlfriend were not gifts requiring disclosure. 414 B.R. at 375. Similarly, in In re Viles, the debtor's failure to disclose the purchase of $2,500.00 worth of clothing for his minor children in the months leading up to bankruptcy, though such purchase were likely unwise, were not gifts as the shopping sprees were normal pre-bankruptcy behavior. Wieland v. Viles (In re Viles), 2010 WL 299246, at *7 (Bankr. D. Kan. 2010); see also Hunerwadel v. Dulock (In re Dulock), 250 B.R. 147, 155 (Bankr. N.D. Ga. 2000). The court believes that Debtor's purchase of a laptop computer for his dependent child is a normal parental purchase not likely to rise to the level of recollection, and the failure to disclose it was not a false statement.

      Similar to Debtor's previous false statements, the outcome turns on Debtor's state of mind. Debtor's explanation for his failure to disclose the gifts of jewelry was simply that he forgot or misread the question. Debtor also argues that he did not consider the watch repair a gift because it was later repaid. A discharge should not be denied based on a debtor's mistakes, but instead only if the debtor acted with fraudulent intent or recklessness. Under the circumstances of this case, the court believes Debtor's failure to disclose the gifts is only a mistake. First, Debtor, when Courtesy was successful, earned a very high income, allowing him to purchase expensive gifts more often than a normal debtor. Even after Courtesy's downfall, Debtor still earned a relatively high income (especially when combining both salary and business income), making the giving of expensive gifts a not totally unusual occurrence, increasing the likelihood that Debtor simply forgot about such transactions. Additionally, in light of Debtor's over $20 million in potentially dischargeable debts, the court believes it very unlikely Debtor would risk his entire discharge over relatively inexpensive assets. See Hunter v. Shoup (In re Shoup), 214 B.R. 166, 175 (Bankr. N.D. Ohio 1997). Trustee also stated that Debtor was forthcoming with explanations after Trustee raised each transaction. While after-the-fact disclosure is not a cure for fraudulent intent, it may help to show that a debtor's omission was only a mistake. See Irish Bank Resolution Corp. Ltd. v. Drumm (In re Drumm), 524 B.R. 329, 396 (Bankr. D. Mass. 2015); In re Courtney, 351 B.R. at 507–08; In re Babb, 358 B.R. at 359. Finally, even if the gifts were properly disclosed, there would be no material difference in the administration of the bankruptcy estate, militating against a finding of intent. The court concludes that Debtor does not

15

have the fraudulent intent necessary to deny discharge under § 727(a)(4)(A) when he failed to disclose certain gifts.

The court notes that a combination of errors and omissions that individually may not rise to the level necessary to deny discharge, when taken in the aggregate, may evidence the requisite fraudulent intent or recklessness. In re McInerney, 509 B.R. at 115. Based on the court's above analysis, even the combination of Debtor's errors are insufficient to deny discharge. UST's complaint seeking to deny Debtor's discharge under § 727(a)(4)(A) is **DENIED**.

### II. Debtor Did Not Transfer or Conceal Property with the Intent to Hinder, Delay, or Defraud Creditors in Violation of §727(a)(2)(A)

Under § 727(a)(2)(A), the court should deny discharge to any debtor, who "with intent to hinder, delay or defraud a creditor, . . . has transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor, within one year before the date of the filing of the petition." Therefore, an action under § 727(a)(2)(A) requires: "(1) the disposition of property, such as a transfer or concealment, (2) a subjective intent on the debtor's part to hinder, delay, or defraud a creditor through the act of disposing of the property, (3) the property at issue must be property of the debtor, and (4) the disposition occurred within one year of filing for bankruptcy." In re Recupero, 2014 WL 1884331, at *6; see also In re Keeney, 227 F.3d at 654. "The purposes of § 727(a)(2)(A) is to prevent the discharge of a debtor who attempts to avert collection of his debts by concealing or otherwise disposing of assets." In re Recupero, 2014 WL 1884331, at *6 (internal quotation marks omitted). While a solitary omission may be sufficient, a pattern of failures is more likely to show fraudulent intent. In re Sowers, 229 B.R. at 157.

UST argues that Debtor's discharge should be denied under § 727(a)(2)(A) based on Debtor's concealment of assets within Horton's bank account. Specifically, UST states that during 2013, at least $23,248.57 of Debtor's income was transferred to Horton and used to pay Debtor's monthly expenses. Pl.'s Ex. M. UST also believes Debtor admitted to fraudulent intent by stating that he began using the Horton account to avoid IRS garnishment. Debtor responds by arguing that the mitigating factors showing his lack of fraudulent intent under § 727(a)(4)(A) also apply to § 727(a)(2)(A). Debtor also argues that using Horton's account does not show fraudulent intent, as parties are not required to "walk into the teeth of every attachment and other coercive action." Def. Richard W. Varner's Post-Trial Br. 18, ECF No. 64.

The court will first evaluate whether Debtor made transfers to Horton's account with fraudulent intent, as required by element (2). Because debtors will rarely, if ever, actively admit fraudulent intent, courts use a debtor's actions to make an inference of such intent. In re Cutler, 291 B.R. 726. Factors past courts have evaluated include:

> (1) a lack of adequate consideration for the property transferred;
> (2) a family or close relationship between the parties;
> (3) the retention of possession for use and benefit;
> (4) the financial condition of the transferor before and after the
> transfer;

16

> (5) the cumulative effect of the transactions and course of conduct
> after the onset of financial difficulties or threat of suit; and
> (6) the general chronology and timing of events

In re Newell, 321 B.R. at 889–90. Courts have also evaluated the materiality of the allegedly fraudulent transfers. In re Zhang, 463 B.R. at 79. Fraudulent intent is ultimately a question of fact for the court based on a balancing of factors. In re Recupero, 2014 WL 1884331, at *13.

The court has already decided Debtor lacked fraudulent intent under § 727(a)(4)(A), and fraudulent intent under § 727(a)(2)(A) is similar. Section § 727(a)(2)(A) requires "subjective intent on the debtor's part to hinder, delay, or defraud a creditor," while § 727(a)(4)(a) requires "the debtor made [a] statement with fraudulent intent." One Ohio bankruptcy court noted that "the standard necessary to support a finding of knowingly making a false statement with the intent to defraud [under § 727(a)(4)(A)] is, for all practicable purposes, identical to the standard required to support a finding of fraudulent intent under § 727(a)(2)." In re Newell, 321 B.R. at 892; see also Giansante & Cobb, LLC v. Singh (In re Singh), 433 B.R. 139, 160 (Bankr. E.D. Pa. 2010); O'Connell v. Klutchko (In re Klutchko), 338 B.R. 554, 570 (Bankr. S.D.N.Y. 2005); Rogers v. Boba (In re Boba), 280 B.R. 430, 435 (Bankr. N.D. Ill. 2002). There are subtle differences between the two causes of action however, as § 727(a)(4)(A) requires fraudulent intent when making a false statement under oath, while § 727(a)(2)(A) requires fraudulent intent in connection with transferring or concealing property. However, the court's finding that Debtor did not have fraudulent intent under § 727(a)(4)(A) strongly weighs in favor of a similar finding under § 727(a)(2)(A).

Even with the similarities, the court believes Debtor's intent deserves a more in-depth evaluation. When transferring money from AAC to Horton, Debtor explicitly made the transfers in order to avoid IRS garnishment, which is an activity designed, at the very least, to hinder creditors. In fact, some courts have found fraudulent intent based on little more than a debtor's admittance that he used a third party account to avoid creditor attachment. See, e.g., Marrama v. Citizens Bank of Mass. (In re Marrama), 445 F.3d 518, 523 (1st Cir. 2006); First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1343 (9th Cir. 1986); In re Schwartz, 527 B.R. at 273–74; Hill v. Jones (In re Jones), 327 B.R. 297, 303 (Bankr. S.D. Tex. 2005); Consumers United Capital Corp. v. Greene (In re Greene), 202 B.R. 68, 72–73 (Bankr. D. Md. 1996). However, this court previously noted that "a debtor is not required to place all of his assets under a flashing sign and hand out instructions directing creditors to the most effective way to collect on their debts." In re Recupero, 2014 WL 1884331, at *14. On the other hand, debtors may not "engage in actions designed to unduly hinder, delay, or defraud legitimate creditor collection efforts." Id. For example, in In re Recupero, this court analyzed a debtor's transfer of his personal earnings into the bank account of a now defunct corporation over which the debtor had complete control. Similar to the current case, the In re Recupero debtor testified that he made the transfers in order to avoid creditor attachment. Id. at *11. While In re Recupero could be distinguished from the current case based on Horton's control over her bank account (as opposed to Debtor control), a number of aggravating factors not present in the current case suggested the In re Recupero debtor acted with mal intent, such as the nondisclosure of a beneficial interest in real property and the failure to make any effort to pay income taxes. Id. at *13.

17

After weighing all the evidence, the court finds that Debtor did not have fraudulent intent when transferring cash to Horton's bank account. First, Debtor used the Horton account to pay normal day-to-day expenses and only the exact amount needed to pay Debtor's bills was transferred, meaning assets did not accumulate in Horton's account. Many cases finding violations of § 727(a)(2)(A) involve situations where a debtor is attempting to retain assets through bankruptcy, a factor not present in the current case. See, e.g., In re Zhang, 463 B.R. at 82–83; In re Newell, 321 B.R. at 890; Mack Fin. Corp. v. Rowe (In re Rowe), 145 B.R. 556, 559–60 (Bankr. N.D. Ohio 1992); In re Sharp, 244 B.R. at 894 (denying discharge over the debtor's attempt to hide $1,200.00 in cash within his father's bank account). A debtor's choice to operate on a strictly cash basis, making creditor attachment substantially more difficult than a debtor utilizing a bank account, is also insufficient to show fraudulent intent without additional aggravating factors. See Warner v. Gallimore (In re Gallimore), 392 B.R. 707, 710 (Bankr. W.D. Ky. 2008) (keeping money in a safety deposit box and withdrawing funds as needed to pay personal expenses did not show fraudulent intent). In the current case, instead of personally paying expenses in cash, Debtor transferred cash to a family member who then made payments on his behalf. Such an arrangement is similar to the cash-only lifestyle from In re Gallimore. The court also finds credible Debtor's testimony that he utilized Horton's account for convenience instead of a tool to unduly harm creditors, as some recurring monthly expenses are difficult or inefficient to pay without a bank account. Transactions occurring just before bankruptcy also raise concerns about improper asset shielding, but Horton's payment of Debtor's recurring expenses was a long-standing arrangement. Finally, while Debtor was using the Horton account he paid large amounts to his creditors, such as decreasing his IRS tax liability from $8 million to $1.6 million, suggesting Debtor's true motive in using Horton's account was not creditor frustration, but instead the desire to have access to sufficient cash to meet day-to-day expenses so that he could continue functioning in order to pay his debts. In sum, based on the above, combined with the court's analysis of intent under § 727(a)(4)(A), Debtor lacked fraudulent intent when transferring assets to Horton's account. UST's action to deny Debtor's discharge under § 727(a)(2)(A) is **DENIED**.

## Conclusion

Based on the above analysis, UST's complaint seeking to deny Debtor's discharge is **DENIED**. An order will be entered simultaneously with this opinion.

It is so ordered.

#  #  #

**Service List**:

**Linda Maria Battisti**
Office of the US Trustee
201 Superior Avenue
#441
Cleveland, OH 44114

**Richard W. Varner**
5976 Penwood Dr
Wadsworth, OH 44281

**Bridget Aileen Franklin**
Brouse & McDowell, LPA
388 S. Main St.
#500
Akron, OH 44311

**Marc Merklin**
Brouse McDowell, LPA
388 S. Main Street, Suite 500
Akron, OH 44311

**Dynele L. Schinker-Kuharich**
Schinker-Kuharich Law Offices, LLC
4300 Lynn Road, Suite 206
Ravenna, OH 44266